101 P.3d 1072 (2004)
In re: The APPLICATION FOR WATER RIGHTS of UNITED STATES of America.
The United States of America, Applicant,
v.
Colorado State Engineer; Division Engineer for Water Division No. 4; Colorado Water Conservation Board; Colorado River Energy Distributors Association; Southeastern Colorado Water Conservancy District; Colorado Farm Bureau; Montrose County Farm Bureau; Delta County Farm Bureau; Colorado River Water Conservation District; Upper Gunnison River Water Conservancy District; and Mt. Emmons Mining, Opposers, and
Environmental Defense; High Country Citizens' Alliance; the Wilderness Society; Western Colorado Congress; Western Slope Environmental Resource Council; and Trout Unlimited, Additional Opposers.
No. 03SA321.
Supreme Court of Colorado, En Banc.
November 8, 2004.
*1074 U.S. Department of Justice, Environment & Natural Resources Division, David W. Gehlert, Denver, for Applicant.
Moses, Wittemyer, Harrison & Woodruff, P.C., Timothy J. Beaton, Gabriel D. Carter, Boulder, for Colorado River Energy Distributors Association.
Ken Salazar, Attorney General, Carol D. Angel, First Assistant Attorney General, Denver, for Colorado Water Conservation Board and for Division Engineer for Water Division No. 4.
Bratton & McClow, LLC, John H. McClow, Marcus J. Lock, Gunnison, for Upper Gunnison River Water Conservancy.
Colorado River Water Conservation District, Peter Fleming, General Counsel, Jill C.H. McConaughy, Associate Counsel, Glenwood Springs, for Colorado River Water Conservation District.
Friedlob Sanderson Paulson & Tourtillott, LLC, Brian M. Nazarenus, William H. Caile, Denver, for Mount Emmons Mining Company.
Burns, Figa & Will, P.C., Lee E. Miller, Englewood, for Colorado Farm Bureau, Delta County Farm Bureau, Montrose County Farm Bureau and Southeastern Colorado Water Conservancy District.
Western Resource Advocates, Bart Miller, Boulder, for Environmental Defense, High Country Citizens' Alliance, The Wilderness Society, Western Colorado Congress, and Western Slope Environmental Resource Council.
Andrew Peternell, Boulder, for Trout Unlimited.
MULLARKEY, Chief Justice.

I. Introduction
The petitioners, various private and public Colorado entities, challenge a stay order entered by the water court that delays quantification of the United States' reserved water right in the Black Canyon of the Gunnison National Park until after federal litigation on related issues is resolved. The stay was requested by several environmental groups ("Environmental Opposers") after they filed an action in federal court contesting the administrative decision making process that led the United States to reduce the amount of water it claims for the park and amend its quantification application. In this original proceeding, petitioners challenge the water court's grant of the stay as an abdication of its jurisdiction and argue that the stay substantially and irreparably harms their ability to litigate the merits of the case. The Environmental Opposers contend that the federal case presents distinct claims over which the federal court has exclusive jurisdiction and that the need for the stay outweighs any prejudice to the petitioners. We review the water court's order for abuse of discretion and uphold it.
The McCarran Amendment, 43 U.S.C. § 666 (2004), allows a party to involuntarily *1075 join the United States as a necessary party in a comprehensive state water court adjudication. The question presented by this case is whether the McCarran Amendment's waiver of sovereign immunity is so broad that it allows state courts to evaluate and adjudicate federal agencies' decision making processes related to the quantification application. Based on our review of the McCarran Amendment's text and legislative history, as well as the text and legislative history of the judicial review provisions of the federal Administrative Procedure Act, we conclude that the scope of the sovereign immunity waiver under the McCarran Amendment is not so broad. From this conclusion, it follows that there must be both state and federal proceedings to resolve all the issues related to the United States' Black Canyon water right.
Because the federal court has exclusive jurisdiction over the federal claims and resolution of those claims may require the United States to claim a greater reserved water right for the Black Canyon, we hold that the water court acted within its discretion when it stayed the proceedings until the federal litigation is resolved. Comity and consideration of the relief available to the parties favor the award of a stay in the water case as well. Given the fact that the quantification proceeding for the Black Canyon has already been delayed for nearly thirty years, we see no great prejudice to the petitioners in temporarily staying the proceedings because they are not precluded from contending that the United States' water right should be narrow. Petitioners are able to, and have taken steps to, protect their rights in the federal proceeding. Given the finality of a decree once it is issued, Environmental Opposers would not be able to protect their interests and federal claims in the same way if the stay were lifted.
We issued a rule to show cause why the water court should not reverse its order granting the motion for stay. Because we find that the water court acted within its discretion in granting the stay, we now discharge the rule.

I. Facts and Procedural History
Quantification of the United States' reserved water right for the Black Canyon of the Gunnison has a long and convoluted history. The Black Canyon first became a national monument in 1933 when President Herbert Hoover designated it as such "for the preservation of the spectacular gorges and additional features of scenic, scientific, and educational interest." Black Canyon of the Gunnison National MonumentColorado, By the President of the United States of America, Proclamation No.2033 (March 2, 1933) at 1. In 1999, Congress passed the Black Canyon Act, elevating the monument to national park status. 16 U.S.C. § 410fff (2004).
Under the reserved rights doctrine, the United States is entitled to the quantity of water from the Gunnison River necessary to satisfy the aesthetic, environmental, recreational and educational purposes for which the Black Canyon was reserved. See Cappaert v. United States, 426 U.S. 128, 138, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). To quantify this right, a court must determine the precise federal purpose to be served, that the purpose would be frustrated without water, and the minimum quantity of water required to fulfill the purpose. United States v. City & County of Denver, 656 P.2d 1, 18 (Colo.1982). A Colorado water court acquired jurisdiction to determine the United States' water rights to the Black Canyon by virtue of the McCarran Amendment. 43 U.S.C. § 666.
On March 6, 1978, after several years of proceedings, the water court issued an interlocutory decree awarding the United States absolute and conditional water rights for the Black Canyon. The decree recognized the United States' priority dates of 1933, 1938, and 1939 for the federal reserved water right. The decree determined the purposes of the reservation: "to conserve and maintain in an unimpaired condition the scenic, aesthetic, natural, and historic objects of the monument, as well as the wildlife therein, in order that the monument might provide a source of recreation and enjoyment for all generations of citizens of the United States." Although the court deferred quantification of the conditional water rights until they were made final at a later date, the decree explicitly recognized that the purposes of the Black *1076 Canyon entitled the United States to direct flow water rights for a broad range of uses. These uses included the "development, conservation, and management of resident and migratory wildlife," "[f]orest improvement and protection uses," "[u]ses for fish culture, conservation, habitat protection, and management," and "[u]ses for the preservation of scenic, aesthetic, and other public values."
Twenty-three years later, the United States filed an application to quantify its conditional water rights for the Black Canyon. In its January 2001 application, the United States claimed year-round base flows of 300 cubic feet per second ("cfs") and higher peak and shoulder flows tied to the expected natural spring run-off each year. Depending upon the quantity of water required to maintain spring peak flows, the United States reserved the right to claim up to an additional 10,000 cfs for part of each year.
More than 380 parties, including the Environmental Opposers, filed statements in opposition to the initial quantification application, and many became parties to the water court case. The water court granted two consecutive six-month stays of proceedings so that the United States could enter into settlement discussions with the parties opposing the application. The Environmental Opposers were not invited to participate in any negotiations concerning settlement.
On April 2, 2003, the United States and the State of Colorado entered into an agreement ("April Agreement"). In the April Agreement, the United States relinquished its reserved right to peak and shoulder flows, and claimed a year-round base flow of the lesser of 300 cfs in-stream or natural flow. On the same day, to reflect this agreement, the United States filed a motion to amend its quantification application and a proposed amended application with the water court.
On July 31, 2003, the United States and the State of Colorado entered into a further Memorandum of Agreement ("MOA") concerning the federal government's water rights for the Black Canyon. Under the MOA, the United States delegated the appropriation of peak and shoulder flows to the Colorado Water Conservation Board's ("CWCB") in-stream flow program, and agreed to a 2003 priority date for these water rights. The United States retained no right to enforce the in-stream water right except through an action for specific performance of the MOA.
The Environmental Opposers objected to the United States' motion to amend its quantification application reducing its claim of water. On August 5, 2003, the Environmental Opposers filed a complaint against the United States regarding the amended application in the federal district court (Case No. 03WY1712CB), and orally requested a stay from the water court. In the federal case, the Environmental Opposers sued the United States Department of the Interior ("Interior"), the National Park Service, and the heads of both agencies in their official capacities (collectively, "the United States"). The federal complaint alleges that the United States' decisions regarding the protection and management of the water-related natural resources of the Black Canyon violated various provisions of federal law, including the National Park Service ("NPS") Act, 16 U.S.C. § 1 (2004), the Black Canyon Act, 16 U.S.C. § 410fff, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 (2004), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 (2004).[1] The Environmental Opposers seek both declaratory *1077 and injunctive relief pursuant to the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 706 (2004). Among their requests is that the federal district court:
Order Defendants to cease their violations of law, specifically by securing river flows for the Black Canyon in quantities and with the frequencies necessary to fulfill the Defendants' obligations to the Park under the NPS Act and the Black Canyon Act and to serve the purposes for which the Black Canyon was reserved, by asserting the federal government's reserved water right or otherwise; [and,] [h]old unlawful and set aside Defendants' Proposed Amended Application in water court as in violation of federal law....
First Amended Complaint ¶ G-H (emphasis added).
On September 12, 2003, the Environmental Opposers filed a written motion for stay of the quantification proceeding for the Black Canyon, asking that a stay be granted until resolution of the federal litigation. The petitioners opposed the stay, arguing that further delay would irreparably prejudice them and that the Environmental Opposers were improperly attempting to transfer jurisdiction over quantification of the Black Canyon reserved right to federal court. The United States also opposed the stay, contending it was inappropriate because the federal litigation would not resolve all issues pending in the water court and because the Environmental Opposers were unable to show a pressing need for the stay.
On October 7, 2003, the water court granted the stay. To reach this conclusion, the court underscored its discretion to decide whether to grant a stay, recognized the desire to avoid piecemeal litigation, and weighed the hardships, delays and prejudice to the petitioners. The court relied upon this court's decision in United States v. Bell, 724 P.2d 631 (Colo.1986), concluding that the Environmental Opposers would be "without adequate recourse" if they ultimately prevailed in their federal complaint and a stay had not been granted by the water court. The water court was careful to limit the parameters of the order:
This Order should not be construed as either deferring quantification of the water right or even whether to grant the Motion to Amend to the Federal Court, but rather, merely to stay these proceedings pending resolution of the federal questions raised in the Complaint filed in Federal District Court.
On April 15, 2004, the federal district court denied the United States' motion to dismiss the Environmental Opposers' federal claims. Relying upon the United States Court of Appeals for the Tenth Circuit's decision in Southern Utah Wilderness Alliance v. Norton, 301 F.3d 1217 (10th Cir.2002) ("SUWA I)" which was later reversed, ___ U.S. ___, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) ("SUWA II"), the court determined that notwithstanding the discretion of Interior and the Park Service to decide the method of protecting the Black Canyon Park's resources, the court had jurisdiction to determine whether the agencies had maintained their non-discretionary, federal statutory duty to protect the park's resources under the judicial review provisions of the APA. The federal court also ruled that the Environmental Opposers had standing under the NEPA and agreed to hear their claims for unauthorized dispossession of federal property and unlawful delegation of authority, finding the United States' agreement with the CWCB merited further review.
The federal court was careful to clarify what it would not determine as well. The order explicitly states that the federal court will not determine "the exact amount of water necessary to fulfill the Park's purpose." However, the court acknowledges in the same sentence that the rights claimed by the United States in its proposed amended application may not satisfy its legal obligation to possess enough water under federal law.
On June 16, 2004, the Environmental Opposers voluntarily dismissed the first claim of their federal complaint, after the United States Supreme Court reversed the Tenth Circuit's decision in SUWA I. ___ U.S. ___, 124 S.Ct. 2373, 159 L.Ed.2d 137. In SUWA II, the U.S. Supreme Court held that a claim under the APA to compel agency action unlawfully withheld or unreasonably delayed *1078 can proceed only where a plaintiff asserts that an agency failed to take an action it was required to take. Id. at 2379. SUWA II further specifies that although courts may direct an agency to act, they have no power to specify terms of compliance with broad statutory mandates. Id. at 2380.
In the original proceeding now before us, petitioners challenge the water court's order staying the quantification proceeding pending resolution of the federal litigation as an abdication of its jurisdiction and responsibility to determine issues regarding the quantification of the federal reserved water right. We issued a rule to show cause why the water court should not be ordered to vacate the stay and requested the parties to brief and argue the issue. Because we find that the water court acted within its discretion in granting the stay, we now discharge the rule.

II. Jurisdiction and Standard of Review
Under C.A.R. 21, we may exercise original jurisdiction to determine whether a trial court has abused its discretion or is proceeding without or in excess of its jurisdiction. People v. Miller, 25 P.3d 1230, 1231 (Colo.2001). Original jurisdiction may also be appropriate when a pre-trial ruling places a party at a "significant disadvantage in litigating the merits of the controversy." Leaffer v. Zarlengo, 44 P.3d 1072, 1077 (Colo.2002). In either circumstance, the threshold consideration is whether conventional appellate remedies are adequate to address the petitioning party's complaint. Id.; Miller, 25 P.3d at 1231.
A stay is not a final order or judgment. Gergel v. High View Homes, L.L.C., 58 P.3d 1132, 1134 (Colo.App.2002). Accordingly, a party challenging the validity of a stay generally does not have recourse to conventional appellate remedies. Id. The only occasions when a stay order is conventionally appealable are when it practically operates as a final order or dismissal, or is equivalent to the refusal to issue a temporary injunction. See Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715 n. 2, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962) (A stay order to await determination of an issue by a state court where no litigation had commenced was appealable as a final order since the appellant was effectively out of court.); Glen Oaks Utils., Inc. v. City of Houston, 280 F.2d 330, 332-33 (5th Cir.1960) (Because a stay order entered in an action for injunctive relief was equivalent to the refusal to issue a temporary injunction, the stay was appealable under 28 U.S.C. § 1292.).
In this case, petitioners invoke the original jurisdiction of this court to challenge the stay, arguing that the order amounts to an abdication of the water court's jurisdiction and irreparably prejudices their ability to litigate the merits of the case. Based on our review of the water court's order, we conclude it was neither so indefinite as to be the practical equivalent of a dismissal, nor so broad in duration and scope that it operated as a final order. The stay order also was not entered in an action for injunctive relief. Therefore, conventional appellate remedies are not available to petitioners to challenge the stay. Because this is a matter of public importance and there is no other avenue available to petitioners, we will exercise our original jurisdiction to determine whether the water court abused its discretion in this case.

III. Analysis
To determine whether the water court abused its discretion in this case, we must first examine the federal reserved rights doctrine, and the jurisdiction of a state court to quantify those rights under the McCarran Amendment. Because we conclude a state court does not have jurisdiction under the McCarran Amendment to determine the Environmental Opposers' federal claims, a federal court must determine those claims. Our remaining task is to consider whether the water court erred when it stayed the quantification proceedings until the federal litigation is resolved. To answer that question, we discuss the standard for determination of a stay and examine whether the water court complied with it. In doing so, we balance the competing benefits and prejudices that would result from granting or denying the stay in this case, including consideration of the potential *1079 effects of res judicata and collateral estoppel.

A. The Federal Reserved Rights Doctrine and the McCarran Amendment
Under the reserved rights doctrine, when the United States withdraws land from the public domain for a federal purpose, it also reserves by implication unappropriated water to the extent necessary to accomplish the purpose of the reservation. Cappaert, 426 U.S. at 138, 96 S.Ct. 2062. Federal reserved rights exist independently of state law. Bell, 724 P.2d at 641. The right does not derive from actual use; instead, it is tied to the stated intent or purpose of the reservation. See Thomas Pacheco, How Big is Big? The Scope of Water Rights Suits Under the McCarran Amendment, 15 Ecology L.Q. 627, 630 (1988) (citing Arizona v. California, 373 U.S. 546, 595-601, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); Winters v. United States, 207 U.S. 564, 575-77, 28 S.Ct. 207, 52 L.Ed. 340 (1908)). The priority date is the date of reservation, and reserved water rights are superior to the rights of all subsequent appropriators. United States v. City & County of Denver, 656 P.2d at 21. The federal government can assert its water rights at any time without abandonment or loss of priority because the rights vest on the date of the reservation. Arizona, 373 U.S. at 618, 83 S.Ct. 1468.
Before the McCarran Amendment was enacted, the United States could not be joined in state water court adjudications without its consent. See Bell, 724 P.2d at 640-1. Because of the prevalence of federal reserved water rights, particularly in the western United States, it was thought that state court procedures for the allocation and determination of water rights were being thwarted by the inability of state courts to ascertain or adjudicate federal water rights with finality. Id. at 641. As a result, meaningful stream adjudications proceeded only when the United States consented to participate. See John E. Thorson, State Watershed Adjudications: Approaches and Alternatives, 42 Rocky Mtn. Min. L. Inst. 22-1, 22-13 (1996).
In 1952, Congress enacted the McCarran Amendment, allowing state courts to involuntarily join the United States as a necessary party in comprehensive state adjudications of water rights.[2] 43 U.S.C. § 666. The legislative history of the McCarran Amendment reveals its dual purposes: 1) to promote certainty and finality, and 2) to avoid needless waste or controversy by requiring the federal government to assert any and all claims to the use of water in a comprehensive state adjudication of water rights. See S.Rep. No. 82-755, at 4-6 (1951).[3] Subsequent cases from the United States and Colorado Supreme Courts implementing the McCarran Amendment have confirmed these parameters and purposes. See, e.g. Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 807-08, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); United States v. Dist. Court, 401 U.S. 520, 525, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971) (Eagle County II); Bell, 724 P.2d at 641-42; United States v. Dist. Court, 169 Colo. 555, 563-65, 458 P.2d 760, 763-64 (Colo.1969) (Eagle County I).
It is clear both from the language of the amendment itself, as well as its legislative history and interpretive precedent that, although McCarran proceedings are intended to be all-inclusive, the waiver of sovereign immunity is limited to proceedings to determine or administer the rights to the use of the water. Colorado River, 424 U.S. at 819, 96 S.Ct. 1236. By its terms, the McCarran Amendment provides:

*1080 Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances....
43 U.S.C. § 666 (emphasis added). The McCarran Amendment does not assert or imply that a state court would have jurisdiction to review the decision making process of federal entities, such as Interior or the Park Service, for compliance with federal law.
Indeed, such a conclusion would run contrary to the Administrative Procedure Act, the federal statute which establishes the practices and procedures followed by administrative agencies in rulemaking and adjudication. The language and legislative history of the APA's judicial review provisions make clear that Congress intended to hold federal administrative agencies answerable for their conduct only in federal courts. 5 U.S.C. §§ 702, 706 (2004). Section 706 provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Section 702 defines the scope of that review: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" is entitled to judicial review and may bring suit against the agency. 5 U.S.C. § 702. However, the suit must be brought "in a court of the United States." Id. Thus, the waiver of sovereign immunity is expressly limited to federal court. See id.; see also Aminoil USA v. Calif. State Water Res. Control Bd., 674 F.2d 1227, 1233 (9th Cir.1982). The APA's legislative history underscores this intent, explicitly stating that the United States will remain immune from suit in state courts. Nat'l State Bank of Elizabeth v. Gonzalez, 266 N.J.Super. 614, 630 A.2d 376, 381 (A.D.1993) (citing H.R.Rep. No. 94-1656, at 11 (1976), U.S.Code Cong. & Admin.News 1976 at pp. 6121, 6131).
The scope of the waiver of sovereign immunity under the McCarran Amendment is not so broad that it allows state courts to evaluate or adjudicate the federal agency decision making processes leading the United States to make a particular water application in a given case. The Environmental Opposers have brought claims in federal court that can only be decided by that court. Thus, there is no question that there will be both state and federal proceedings before the United States' reserved water right for the Black Canyon can be fully resolved. The federal case will decide whether the United States' amended application complied with the applicable federal law, and the state case will quantify the reserved water right. We recognize that the federal case may have an impact on the water court proceeding. Indeed, if the federal case had no impact on the state case, there would be no need for a stay. However, the water court will decide the quantification of the federal reserved right even if the federal court finds that the agency decision making was flawed and must be redone.
The only question remaining is whether the water court's decision to stay the proceedings and allow the federal case to be resolved first constituted an abuse of discretion. To answer this question, we examine the standard for determination of a stay, and consider whether the water court met it.

B. Stay of Proceedings
A trial court generally has discretion to grant or deny a stay. Landis v. N. Am. Co., 299 U.S. 248, 254-55, 57 S.Ct. 163, 81 L.Ed. 153 (1936); In re Marriage of Fleet, 701 P.2d 1245, 1247 (Colo.App.1985). This discretion derives from "the power inherent in every court to control the disposition of the causes on its docket with economy *1081 of time and effort for itself, for counsel, and for litigants." Landis, 299 U.S. at 254, 57 S.Ct. 163. Thus, we review the water court's order in this case for abuse of discretion, a highly deferential standard. Absent a finding that the lower court's actions were manifestly arbitrary, unreasonable, or unfair, this court will not overturn discretionary decisions. People v. Riggs, 87 P.3d 109, 114 (Colo.2004).
Parties have the right to a determination of their rights and liabilities without undue delay. We have recognized the "tremendous uncertainty" that may be caused by conditional reserved water rights and urged that quantification of such rights be a priority of the water courts. United States v. City & County of Denver, 656 P.2d at 30. Thus, in any case, but particularly in the context of a reserved water right adjudication, the party requesting a stay must demonstrate a pressing need, and that it will suffer prejudice that exceeds potential harm to the other parties if the stay is not granted. See Adolph Coors Co. v. Davenport Mach. & Foundry Co., 89 F.R.D. 148, 153 (D.Colo.1981). To survive appellate review, the delay must not be "immoderate in extent" or "oppressive in its consequences." Landis, 299 U.S. at 256, 57 S.Ct. 163. Only rarely may a court compel a litigant in one case to stand aside while a litigant in another case settles the rule of law that will define the rights of both. Id. at 255, 57 S.Ct. 163.
Faced with a request for a stay, the trial court must examine all the circumstances of the case before it. When asked to stay a federal case pending a decision in state cases, the U.S. District Court for the District of Colorado identified the following relevant considerations:
comity, the extent of disputed factual (as opposed to legal) issues involved, the order in which the courts obtained jurisdiction, adequacy of relief available in state court, avoidance of maneuvers to clog efficient judicial machinery, the need for comprehensive litigation, and the desirability of avoiding piecemeal litigation.
Adolph Coors, 89 F.R.D. at 153. However, it is not a necessary prerequisite that the parties and issues in concurrent federal and state actions be identical. Landis, 299 U.S. at 254, 57 S.Ct. 163. Likewise, pendency of an action in state court, in and of itself, does not prevent a federal court from exercising jurisdiction over the same matter in a separate federal proceeding. Adolph Coors, 89 F.R.D. at 152.
Indeed, notwithstanding a state court's exercise of its concurrent jurisdiction in the same case, federal courts have a "virtually unflagging" obligation to decide cases over which they have jurisdiction. Colorado River, 424 U.S. at 817, 96 S.Ct. 1236. Abdication of this obligation is justifiable "only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." Id. at 813, 96 S.Ct. 1236.
If the circumstances warrant, however, a court will stay its case pending resolution of independent proceedings which bear upon the case. Leyva v. Certified Grocers of Calif., 593 F.2d 857, 864 (9th Cir.1979) (trial court had authority to stay adjudication of employment claims pending arbitration of contract claims which would be of valuable assistance to the court); Procter & Gamble Distrib. Co. v. Lloyd's Underwriters, 44 Misc.2d 872, 255 N.Y.S.2d 361, 364-66 (N.Y.Sup.Ct.1964) (state trial court had authority to stay proceedings until determination of two pending federal court actions on related issues). But see Adolph Coors, 89 F.R.D. at 153 (federal district court declined to stay proceedings despite the pendency of a state court action in the same case because it was not clear whether the state court would have jurisdiction over the case).
Appellate courts also will affirm the award of a stay if the balance of prejudices and interests of the parties justified the delay. For instance, the United States Court of Appeals for the Third Circuit approved a stay order in Cheyney State Coll. Faculty v. Hufstedler, 703 F.2d 732 (3rd Cir.1983). A class of plaintiffs had alleged that Pennsylvania operated a segregated system of higher education. Id. at 734. The court concluded that stay of the litigation did not constitute an abuse of discretion because it was possible that the complex problems presented by *1082 the case could more readily be remedied through the flexibility of the administrative process actively in progress. Id. at 738. In Chronicle Publ'g Co. v. National Broad. Co., the United States Court of Appeals for the Ninth Circuit similarly found a stay order was appropriate pending investigation by the Federal Communications Commission of defendant's acquisition of a television station. 294 F.2d 744, 747-48 (9th Cir.1961). Because the issue being litigated was whether the acquisition violated antitrust laws, the court reasoned that staying the case until the Commission concluded its investigation was justifiable in order to avoid complex, duplicative proceedings. Id. at 749.
Courts disapprove stays of proceedings in cases when a lesser measure is adequate to protect the moving party's interests or when the balance of interests and prejudices comes out in the non-moving party's favor. In Dellinger v. Mitchell, the United States Court of Appeals for the District of Columbia Circuit held that the total stay of proceedings in a civil action related to a criminal case was immoderate and invalid. 442 F.2d 782, 787 (D.C.Cir.1971). The United States had moved to stay the proceedings because it was concerned that the civil action was a stratagem to circumvent orders in the criminal case limiting pretrial discovery. Id. at 785. In the court's view, a protective order regarding discovery would have been adequate to protect the government's interests.[4]Id. at 787.
When the harm to the non-moving party is greater than the prejudice caused to the moving party if the case were to proceed, the reviewing court will invalidate a stay. In Rehm v. Clayton, for example, the Kentucky Supreme Court held the trial court abused its discretion in a products liability action when it stayed discovery pending the outcome of an appeal of summary judgments in favor of the defendants. 132 S.W.3d 864, 870 (Ky.2004). The court held that the potential harm to the plaintiffs caused by the stay outweighed the slight risk that defendants would be required to repeat the discovery process if the summary judgments were reversed. Id. See also Ohio Envtl. Council v. Dist. Court, 565 F.2d 393 (6th Cir.1977); Sec. Ins. Co. of Hartford v. Trustmark Ins. Co., 283 F.Supp.2d 612 (D.Conn.2003).
In this case, the water court granted the Environmental Opposers' motion to stay the proceedings based on its understanding of the doctrine of res judicata as applied to reserved rights adjudications. The water court reasoned that if it denied the stay and approved the United States' amended quantification application, the Environmental Opposers would be without adequate recourse if they later prevailed on their federal claims. It reasoned that res judicata would prevent the reopening of the quantification decree.
Petitioners, however, contend the stay substantially and irreparably harms them because it causes delay and uncertainty and requires their costly participation in the federal case. Petitioners maintain as well that determinations in the federal case will determine the parameters of quantification of the United States' water right with preclusive effect. In response, Environmental Opposers argue that the federal case presents distinct claims over which the federal court has exclusive jurisdiction, that resolution of the federal claims will not quantify the Black Canyon water right, and that the need for the stay outweighs any prejudice to the petitioners.
We hold the water court did not abuse its discretion in this case. To reach this conclusion, we balance the competing interests and prejudices to the parties.

C. Balance of Interests and Prejudices
To evaluate whether the water court abused its discretion we must consider all of the relevant facts and circumstances of the case. Although not binding on us, the Adolph Coors factors provide a good framework for our analysis. The applicable Adolph Coors factors are: 1) the order in *1083 which jurisdiction was obtained, 2) the adequacy of relief available in state court, 3) comity, and 4) the need for comprehensive adjudication and attendant desire to avoid piecemeal litigation.[5]
First, as to the order of jurisdiction, the fact that the state water court obtained jurisdiction over the Black Canyon case before the federal case was initiated does not persuade us that the water court abused its discretion in granting the stay. The dual pending actions involving the Black Canyon water right will not resolve the same issue. Accordingly, this case is distinguishable from Colorado River, where the U.S. Supreme Court upheld the dismissal of a reserved rights adjudication initiated by the United States in federal court because a state water court was in the process of adjudicating the same case and the same rights. 424 U.S. at 800, 96 S.Ct. 1236. In this case, the state and federal proceedings involve different parties, claims, and issues. The order in which the state and federal courts obtained jurisdiction is even less compelling given the fact that the federal court has the sole authority to resolve the federal claims. Adolph Coors presented a very different scenario. There, the federal court declined to stay its proceedings because the state case was in its initial stages and it was unclear whether the state court would even have jurisdiction to try the case. 89 F.R.D. at 153.
Second, consideration of the relief available to the parties favors the award of a stay in this case. This court's decision in Bell as well as U.S. Supreme Court precedent has made clear that once the water court enters a decree, the doctrine of res judicata bars the United States from reopening a reserved water rights adjudication even where prior claims have not been adjudicated or the United States erroneously omitted certain claims. 724 P.2d at 643; Nevada v. United States, 463 U.S. 110, 130-31, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983); Arizona v. California, 460 U.S. 605, 619, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). Accordingly, if the water court were to proceed with this case, and enter a decree quantifying the United States' federal reserved water right, res judicata would bar the United States from later claiming a broader reserved right even if the federal court were to decide that the United States violated federal law when it amended its application. Because of this avoidable potential for conflict between federal and state courts, comity, the third factor, favors the award of a stay in this case.
We note as well that petitioners will not suffer the same level of prejudice if the water court's stay is upheld. Because the federal claims are necessarily intertwined with quantification of the United States' reserved water right, several of the petitioners have intervened in the federal case. Notwithstanding their invocation of the original jurisdiction of this court, petitioners have taken steps in order to protect their interests in the federal forum, although with the obvious result that they may incur considerable cost and effort to do so.
The stay will cause a delay of the water court's quantification proceeding. Although that delay is regrettable, we note that this proceeding has already been pending for nearly thirty years. Petitioners can show no great harm attributable to this relatively short delay. As we discussed earlier in this opinion, the state and the United States recently sought and were granted a twelve month delay by the water court in order to settle the case. The Environmental Opposers, however, were excluded from the settlement negotiations.
The water court explicitly retained its jurisdiction to quantify the United States' reserved water right. The fact that the federal case may decide that the United States violated federal law when it reduced its water *1084 claim does not amount to a quantification of the water right. As the Supreme Court stated in SUWA II, under the APA, a federal court may direct an agency to act, but may not tell it what decision to reach. See, SUWA II, 124 S.Ct. at 2379. Because the federal action cannot and will not quantify the water right, we find that the stay order is not an abdication of the water court's jurisdiction. When the water court proceeding resumes, petitioners may still argue that the purposes of the United States' reservation of the Black Canyon are narrow, and that a modest amount of water is adequate to satisfy those purposes. The Petitioners do not face the res judicata barrier that will confront the Environmental Opposers if there were no stay.
Fourth and finally, the need for comprehensive adjudication and the desire to avoid piecemeal litigation do not warrant a lifting of the stay in this case. Because of the exclusivity of the federal court's jurisdiction over the federal claims, dual proceedings are necessary and the McCarran Amendment's policy to avoid piecemeal litigation is inapplicable. As stated above, resolution of the federal case may influence the parameters of the water court's decision, but it will not quantify the United States' reserved water right.

IV. Conclusion
Because the federal court has exclusive jurisdiction over the federal claims raised by the Environmental Opposers and resolution of those claims may require the United States to claim a broader reserved water right for the Black Canyon of the Gunnison National Park, we hold that the water court acted within its discretion when it stayed its proceedings until the federal litigation is resolved. Our review of the prejudices and competing interests in this case favor upholding the stay. We therefore discharge the rule and remand the case to the water court.
Justice HOBBS dissents, and Justice KOURLIS joins in the dissent.
Justice HOBBS Dissenting.
I respectfully dissent. In my view, the water court abused its discretion in granting the stay of this McCarran Amendment case. Relying on the same law the majority cites, I reach a contrary conclusion.
The plaintiffs are conducting a federal court lawsuit that pertains to the quantification and administration of federal reserved water rights for the Black Canyon of the Gunnison National Monument, now a national park. This federal suit challenges the authority of the Secretary of Interior and the National Park Service to approve and submit, through the United States Justice Department, an amended quantification claim and water rights administration settlement agreement to the water court in a McCarran adjudication.
The plaintiffs have requested the District Court for the United States District of Colorado to issue an order "securing river flows for the Black Canyon in quantities and with the frequencies necessary to ... serve the purposes for which the Black Canyon was reserved."
The allegations and prayers for relief in the federal court action transparently involve quantification and administration of the Black Canyon of the Gunnison reserved water right in relation to other rights, state and federal, on the Gunnison River. These water rights include those held by the United States for the Aspinall Unit of the Colorado River Storage Project Act, situated above the Black Canyon of the Gunnison National Park.
The McCarran Amendment provides comprehensive jurisdiction in the water court to determine all factual and legal issues regarding the quantification and administration of the Black Canyon of the Gunnison reserved water right. Indeed, the water court had already recognized the existence of an implied federal reserved water right for the Black Canyon and was addressing the quantification and administration phase of the case, when some of the parties to the state water rights case initiated the federal case.
Neither state nor federal courts have exclusive jurisdiction over the issues involved in *1085 either action, but the McCarran Amendment highly favors deferral of the federal action to the ongoing state case. In my view, the plaintiffs' federal court litigation results in a piecemeal approach to the quantification and administration issues properly before the water court, the very result Congress sought to avoid by adopting the McCarran Amendment.
Under the circumstances, we should be ordering the water court to proceed with considering and determining all factual and legal issues pertaining to (1) the C.R.C.P. 15 motion of the United States to amend its quantification claims ("motion to amend"); and (2) the settlement agreement for administration of the interrelated rights on the river, pursuant to the agreement between the United States and the State of Colorado ("administration agreement"), along with all other matters presented. If the state and federal trial and appellate courts were to reach inconsistent results, the United States Supreme Court could, of course, resolve them.

A. The McCarran Amendment Comprehensively Waives Sovereign Immunity for State Court Determination of All Factual and Legal Issues Regarding Quantification and Administration of the Black Canyon Federal Reserved Water Right
Congress adopted the McCarran Amendment to confer on state courts the authority to adjudicate all factual and legal issues pertaining to the existence, nature, scope, and administration of federal reserved water rights of United States agencies and Native American Tribes. The comprehensive nature of this authority was delineated by the United States Supreme Court in the "Colorado trilogy": Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("Colorado River"); United States v. District Court in and for Water Division No. 5, 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971) ("Division No. 5"); United States v. District Court in and for Eagle County, 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971) ("Eagle County").
Those cases arose out of repeated attempts by the United States Justice Department to have issues of federal law involving the adjudication and administration of reserved rights claims determined in the federal courts. Colorado prevailed in its view that the overarching congressional policy, upon proper joinder of the United States, was that all issues of law and procedure in such cases would be determined by the state courts, subject to review by the United States Supreme Court.
We have made it clear that "by enacting the McCarran Amendment, Congress recognized that the western states have a legitimate interest in and responsibility for the allocation of water resources within their borders, including the determination and adjudication of the water rights claimed by the United States." United States v. City and County of Denver, 656 P.2d 1, 9 (Colo.1982) ("City and Countyof Denver I"). These issues include the "volume and scope" of particular reserved rights claims: "[a]ll such questions, including the volume and scope of particular reserved rights, are federal questions which, if preserved, can be reviewed [by the United States Supreme Court] after final judgment by the Colorado court." Eagle County, 401 U.S. at 526, 91 S.Ct. 998. Through the McCarran Amendment, Congress intended "to promote certainty in water allocation by subjecting undeclared and unquantified federal water rights to state adjudication." United States v. Bell, 724 P.2d 631, 642 (Colo.1986).
Issues involving the interaction of state water rights with federal water rights are within the state court's authority to determine. Division No. 5, 401 U.S. at 529-30, 91 S.Ct. 1003 (holding that, "if there is a collision between prior adjudicated rights and reserved rights of the United States, the federal question can be preserved in the state decision and brought here for review").
In Bell, as here, we had before us a C.R.C.P. 15 motion by the United States to amend its previously submitted claims. We upheld the water court's denial of the motion, despite the contention of the United States that its substantive rights would be adversely affected by the procedural ruling:

*1086 The next question is whether the water court properly applied C.R.C.P. 15 in allowing the amendment. C.R.C.P. 15(a) provides that after a responsive pleading is filed, pleadings may be amended by a party only by consent of the adverse party or by leave of court but that such "leave shall be freely given when justice so requires." The decision to grant an amendment is within the trial court's discretion. We have interpreted C.R.C.P. 15(a) liberally in allowing amendments.
Bell, 724 P.2d at 637 (internal citations omitted). We relied on the Senate Report to the McCarran Amendment in so holding:" `it is essential that each and every owner along a given water course, including the United States, must be amenable to the law of the state, if there is to be a proper administration of the water law as it has developed over the years.'" Id. at 643 (quoting S. Rep. 755 at 6).
In Bell, we upheld the water court's refusal to allow the United States to amend its late-noticed claim under C.R.C.P. 15, because the "McCarran Amendment's effect was to place federal reserved rights within the state adjudication system" and "certainty provided by adjudication of the United States' reserved rights through joining the United States in state court water adjudications would be destroyed." 724 P.2d at 645. Accordingly, in setting the priority date, quantifying the claim, and administering the right, federal substantive law and state procedural law apply. Id. at 643.
In light of the clear and repeated congressional intent to allow the state court to proceed with resolving all issues involved with setting the priority, quantifying the claims, and administering the water rights-as construed by our decisions and those of the United States Supreme Court-I would hold that the water court abused its discretion by staying consideration of both the motion to amend and the administration agreement.

B. The Water Court's Stay Order Should Be Vacated
We should vacate the water court's stay order for the following reasons.
First, in my view, plaintiffs are mistaken when they (1) assert claims against the Secretary of the Interior and the National Park Service involving the quantification and administration of the Black Canyon of the Gunnison reserved water right, and then (2) contend that issues involving the authority of that officer and agency to submit the motion to amend and the administration agreement to the water court are exclusive to the federal court.
The McCarran Amendment expressly provides for the state court to decide all factual and legal issues affecting the quantification and administration of the right, which the plaintiffs' claims in federal court surely do: "[c]onsent is given to join the United States as a defendant in any suit (1) for the adjudication of the rights to the use of water of a river system or other source, or (2) for the administration of such rights." 43 U.S.C. § 666 (2004) (emphasis added).
In waiving the sovereign immunity of the United States in all such matters, the McCarran Amendment further recites that the United States "shall be subject to the judgments, orders, and decrees of the court having jurisdiction ... to the same extent as a private individual under the circumstances." Id.
In my view, plaintiffs are wrong in their federal court exclusivity contention. Although the claims in the federal suit are styled as Administrative Procedure Act claims, which is normally an area of exclusive federal jurisdiction, in essence they challenge the exercise and scope of discretion in federal agencies administering their water rights under state and federal law. The water court has authority under the McCarran Amendment, a special statutory proceeding established by Congress to which federal officers and agencies are subject, to decide all factual and legal issues involved in the motion to amend and the administration agreement. This authority includes review of the decision making of those officers and agencies regarding the motion to amend and the administration agreement. The requisite federal officers and agencies have already appeared in the water court through the representation *1087 of the United States, as have the plaintiffs who filed the federal court action.
Accordingly, I disagree with the majority's conclusion that the McCarran Amendment does not assert or imply that a state court "would have jurisdiction to review the decision making process of federal entities, such as Interior or the Park Service, for compliance with federal law." Maj. Op. at 1080. To the contrary, the assertions of federal agencies regarding their authority and the exercise of it are routinely at issue in McCarran adjudications.
While both the water court and the District Court have jurisdiction over federal reserved water right questions, the McCarran Amendment prefers deferral of the federal court to the state court, not the other way around. Colorado River, 424 U.S. at 818-19, 96 S.Ct. 1236. If both actions proceed, inconsistent results between the state and federal courts, if any, can be resolved by the United States Supreme Court.
Second, should the water court's stay remain in effect and the federal action proceed, the federal courts  and ultimately the United States Supreme Court on review  will be deprived of the water court's comprehensive view of the interaction of all federal and state water rights on the Gunnison River. This view lies at the heart of the McCarran Amendment's grant of jurisdiction and authority for state court determinations. "The resolution of the complex issues relating to federal reserved rights requires the water court to have a proper factual predicate before an attempt is made to resolve the legal issues." City and County of Denver v. United States, 656 P.2d 36, 39 (Colo.1982).
The United States Supreme Court has emphasized that "[t]his careful examination is required both because the reservation is implied, rather than expressed, and because of the history of congressional intent in the field of federal-state jurisdiction with respect to allocation of water." United States v. New Mexico, 438 U.S. 696, 701, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978). An evident purpose of the United States' motion to amend and administration agreement is to bring certainty, security, and reliability to water rights administration on the Gunnison River.
The integration of federal rights into the network of highly interdependent relative priorities for the use of water on common stream systems is the ultimate purpose of the McCarran adjudication. See City and County of Denver I, 656 P.2d at 20. Necessarily, the quantification and administration of the Black Canyon reserved water right is fact-specific. It involves mixed questions of fact and law and issues regarding, for example, congressional intent in approving construction of the federal Aspinall Unit of the Colorado River Storage Project in 1956. When it authorized that project to operate above the Black Canyon, Congress was fully aware of the Black Canyon Monument designation of 1933. Logically, it might have intended that the Black Canyon quantification be consistent with upstream Aspinall Unit storage and operation. At least, the water court should have the opportunity to address and decide this issue.
Indeed, the administration agreement that the plaintiffs ask the federal court to review appears to take into account Black Canyon flow requirements and exercise of the Aspinall Unit water rights vis-a-vis each other and within the context of other water rights on the Gunnison River. We have previously addressed the Aspinall water rights, as well as the subordination of those rights to a certain quantity of upstream state appropriative water rights in Board of County Commissioners v. Crystal Creek Homeowners Association, 14 P.3d 325 (Colo.2000).[1]
*1088 As the Secretary of Interior has duties and discretion in regard to both the national park and the reclamation project, carrying out those duties and implementing that discretion is not readily subject to piecemeal judicial review. Surely, Congress intended the McCarran Amendment's waiver of sovereign immunity to allow responsible federal officers and agencies the authority and ability to assert federal water interests in a manner that recognizes and accommodates important state water interests. Given that the United States' Black Canyon water right is an implied rather than an express water right, the managing agencies have discretion as to the management of the right.
Judicial involvement in such discretionary agency duties is just what the United States Supreme Court was concerned about when it found that Administrative Procedure Act claims cannot challenge agencies' discretion in carrying out a broad statutory mandate. See Norton v. Southern Utah Wilderness Alliance, ___ U.S. ___, 124 S.Ct. 2373, 2381, 159 L.Ed.2d 137 (2004) ("If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved-which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance...."). By its very nature, the quantification of an implied reserved right is within the category of a broad statutory mandate; had Congress intended otherwise, it would have created an express reserved right.
In United States v. Idaho, 135 Idaho 655, 23 P.3d 117, 124-25 (2001), the Idaho Supreme Court considered the effect of congressional reclamation project approval on certain implied reserved water rights claims of the United States to waters of the Snake River. That court held that certain of the claimed reservations of water did not exist.
In the case before us, Colorado courts do recognize the existence of the implied federal reserved water right for the Black Canyon of the Gunnison; yet its quantification and administration may be impacted by other congressional intent and actions which, apparently, are not before the District Court. If the District Court orders the United States to increase its water claims, as the plaintiffs request, the result could well be an acre-foot for acre-foot reduction in the water use for those who depend on the Aspinall Project or its subordination to upstream rights.[2] Congress may have intended that this not occur, and the United States officers and agencies have discretion to discharge their broad statutory duties.
Accordingly, I disagree with the majority's conclusion that the "federal case will decide whether the United States' amended application complied with applicable federal law, and the state case will quantify the reserved water right." Maj. Op. at 1080. Such a neat distinction does not accord with the interrelated factual and legal issues in such a case as this, and, I conclude, derogates the long history of the Colorado courts' role in McCarran adjudications.
Unfortunately, some language of the federal court's April 15, 2004 order adopts the plaintiffs' characterization that the United *1089 States is "relinquishing" its water right and "disposing" of federal property. Of course, this is not so, in my view. In the water court's McCarran proceeding, the United States bears the burden of demonstrating the amount of water necessary to prevent the entire defeat of the primary purposes of the Black Canyon reservation. See New Mexico, 438 U.S. at 700, 98 S.Ct. 3012. At this stage of the proceeding, the United States has only made claims to water, it has not obtained a decreed amount. As the water court has not yet quantified an amount, amending a claim cannot be characterized accurately as "disposing of property." Water right claimants often modify their claims in light of opposers' arguments and evidence. Until the water court issues its final decree quantifying the reserved right, the amount of water assigned to that right has not been duly ascertained. Once the final decree quantifies the right, the United States will have a property interest in the use of a specified amount of water.
The federal court's order referring to "relinquishment" and "disposal of property" foretells that it will be engaging in a quantification inquiry proper to the McCarran Amendment proceedings. With all due respect, the line between the Administrative Procedure Act issues and the McCarran issues, in light of plaintiffs' allegations and prayers for relief, is illusory.
The water court, not the United States District Court, is in the preferred position  according to explicit congressional policy  to examine the factual basis underlying the United States' motion to amend and administration agreement. The litigation before the federal court clearly is only a piece of a complex interrelated puzzle of the type Congress envisioned in adopting the McCarran Amendment for state court determination of rights to the use of water from the same stream system.
Third, the law favors settlements in these complex proceedings by state and federal parties owning rights to waters of the same stream. Across the United States, complex stream adjudications are underway to determine federal and state-law based claims of federal, state, and local governmental agencies and private parties. For example, Idaho's Snake River adjudication addresses 185,000 claims for water rights. See John E. Thorson, "State Watershed Adjudications: Approaches and Alternatives," in 42 Rocky Mt. Min. L. Inst. § 22.05(3) (1996).
Settlement and accommodation of multiple interests can often promote both environmental and water user interests. The setting of quantification amounts in an implied reserved water rights case is not an exact science. Expensive and conflicting expert testimony is often necessary. The legal standard operable at trial allows quantification of only the minimum amount of water necessary to carry out the purposes of the federal reservation. See City and County of Denver I, 656 P.2d at 20. "Each time this Court has applied the `implied-reservation-of-water doctrine,' it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated." New Mexico, 438 U.S. at 700, 98 S.Ct. 3012.
All of these considerations, together with the uncertainty and expense of prolonged litigation, promote settlement. "The successful completion of reserved water rights settlements is probably the brightest achievement associated with western stream adjudication.... The sentiment is strong that these settlements encourage local cooperation, develop more lasting and satisfactory solutions, and avoid the expense and conflict of litigation." Thorson, "State Watershed Adjudications: Approaches and Alternatives" § 22.06(6) at 22-47.
Fourth, I believe the majority, in upholding the water court's stay order, underemphasizes the harm to the state of Colorado and its water users, and overemphasizes the harm to the plaintiffs. In the context of the McCarran Amendment, a high degree of deference to the water court is not warranted when the effect of the stay is an unascertainable delay in managing and completing the adjudication. There can be no finality until the water court finally determines the quantification and administration issues, and we and the United States Supreme Court have had the opportunity to hear any resulting *1090 appeals. With the stay order in effect, the water court apparently cannot proceed until the federal piece of litigation is concluded, and the bulk of water rights holders on the Gunnison River remain insecure in the viability of their uses.

II.
In consideration of the strong congressional policy expressed in the McCarran Amendment, I conclude that the water court abused its discretion in granting the stay in this case. We should be ordering the water court to proceed with determination of all matters involving the quantification and administration of the Black Canyon of the Gunnison implied reserved water right.
I am authorized to state that Justice KOURLIS joins in this dissent.
NOTES
[1] We cite to the current statutes since none of these statutes have changed since the present action began in 2003. The claims are: 1) the United States failed to act as required by the NPS Act and Black Canyon Act because it did not protect the water related natural resources of the Black Canyon of the Gunnison National Park; 2) the United States' violated the NPS Act and Black Canyon Act when it relinquished and otherwise limited its reserved water right by relying upon an inadequate state-law in-stream flow right; 3) the United States violated NEPA by failing to carry out environmental analysis of the decision to rely on a state law in-stream flow right for protection of park resources; 4) the United States violated federal law prohibiting unauthorized dispossession of federal property when it relinquished much of its reserved water right for the Black Canyon; and 5) the United States unlawfully delegated authority under the NPS Act and Black Canyon Act when it gave authority and responsibility to the State of Colorado to protect the park's water rights and other resources.
[2] The McCarran Amendment was ultimately enacted into law as an amendment to an appropriations bill for the Departments of State, Justice, Commerce, and the Judiciary. However, the law had been introduced as S. 18 in 1951, and a prior version was introduced as S. 2304 in 1949. Legislative history on the amendment largely derives from senate hearings on S. 18. See Bennett W. Raley, Chaos in the Making: The Consequences of Failure to Integrate Federal Environmental Statutes with McCarran Amendment Water Adjudications, 41 Rocky Mtn. Min. L. Inst. 24-1, 24-22 (1995).
[3] Senator McCarran also made clear that these were the only purposes of the proposed amendment: "[S. 18] is not intended to be used for any other purpose than to allow the United States to be joined in a suit wherein it is necessary to adjudicate all of the rights of various owners on a given stream." S.Rep. No. 82-755, at 9 (1951).
[4] The government contended that the D.C. Circuit was without jurisdiction to consider the stay because it was not a final order. Dellinger, 442 F.2d at 789. The court concluded that the case was appealable not as of right, but by application for writ under the All Writs Act, 28 U.S.C. § 1651 (1964). Id.
[5] The extent of disputed factual issues and judicial economy are not applicable in this case. The basic facts in this case are not in dispute. Judicial economy is also not relevant because when the state courts enter a final decree, the doctrine of res judicata bars the United States from claiming a broader reserved right, regardless of the federal court's resolution of the federal claims. Bell, 724 P.2d at 643. Therefore, the fact that some of the federal claims are necessarily intertwined with quantification of the reserved right is relevant to comity and the adequacy of relief in state court for the Environmental Opposers, rather than relevant to the interests of judicial economy.
[1] In Crystal Creek, we stated that:

Congress approved the construction and operation of several dams and reservoirs, including the Aspinall Unit, for the nonexclusive purposes of
regulating the flow of the Colorado River, storing water for beneficial consumptive use, making it possible for the States of the Upper Basin to utilize, consistently with the provisions of the Colorado River Compact, the apportionments made to and among them in the Colorado River Compact and the Upper Colorado River Basin Compact, respectively, providing for the reclamation of arid and semiarid lands, for the control of floods, and for the generation of hydroelectric power, as an incident of the foregoing purposes.
Congress also stated that it did not intend for [the Colorado River Storage Project Act, CRSPA] to impede the Upper Basin's development of the water apportioned to it by the Compact.
We agree that the CRSPA reservoirs are part of a plan to allow Colorado to develop and preserve Compact apportionment. However, we find that the stored water provides Colorado with an ability to satisfy the Compact delivery mandates without eroding other rights decreed to beneficial use in the state.
14 P.3d at 334 (internal citations omitted).
[2] In regards to the subordination of rights, we found:

the in-basin 60,000 acre-foot subordination by the United States is valid. The construction of the Aspinall Unit greatly benefited the Gunnison River Basin, but not without adverse effects. The dams inundated many miles of prime trout fishing and flooded several properties. To offset these losses, the United States agreed to set aside 60,000 acre-feet of water for future projects to benefit the Upper Gunnison River Basin. The United States intended that the future projects would develop water resources for use within the Upper Gunnison River Basin.
Crystal Creek, 14 P.3d at 341.